**In re Tommy F. ROBINSON, Debtor.**

**No. 2:05–bk–13915M.**

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

April 17, 2007.

Sheila F. Campbell, Sheila Campbell, P.A., Little Rock, AR, for Debtor.

Frederick S. Wetzel, Frederick S. Wetzel, P.A., Little Rock, AR, trustee.

### ORDER OF CONTEMPT

JAMES G. MIXON, Bankruptcy Judge.

The Debtor Tommy F. Robinson ("Robinson") is a resident of Brinkley, Monroe County, Arkansas. Roy C. Lewellan ("Lewellan") is an attorney duly licensed to practice in this Court and is a resident of Marianna, Lee County, Arkansas. On December 21, 2006, Wildlife Farms II, LLC a/k/a Mallard Pointe Lodge and Reserve, LLC ("Wildlife Farms"), William Thompson ("Thompson"), and Boyd Rothwell ("Rothwell") filed a motion for an order of contempt against Robinson, Carolyn Robinson, Greg Robinson, Jeff Robinson, Ag Pro Farms of Arkansas, Inc., Ag Pro Farms, II, and Lewellan for violating a restraining order that was entered by this Court on July 28, 2006. (Bankruptcy Case 2:05–bk–13915, Motion for Contempt, 12/21/06, docket entry number 235.)

Trial on the motion for order of contempt was held in Helena–West Helena, Arkansas, on February 26, 2007, and at the conclusion of the hearing the Court found Carolyn Robinson, Greg Robinson, and Jeff Robinson were not in civil contempt. (Tr. 02/26/07 at 188–189.) However, Robinson and Lewellan were found to be in civil contempt for the reasons stated in open Court. (Tr. 02/26/07 at 189–190 and Order Granting Mot. for Contempt, 2/27/07, docket entry number 266.) Robinson and Lewellan were ordered remanded to the custody of the acting United States Marshall until they purged themselves of civil contempt by complying with the Court's instructions stated in open Court. (Tr. 02/26/07 at 190.)

At the conclusion of the hearing the Court announced its intention to impose criminal contempt sanctions against Robinson and Lewellan. (Tr. 02/26/07 at 191.)

Robinson and Lewellan purged themselves of civil contempt the next day on

February 27, 2007, and an order was entered releasing Robinson and Lewellan from custody. (Bankruptcy Case 2:05–bk–13915, Order that Tommy Robinson and Roy C. Lewellan have purged themselves of civil contempt by delivering the required certified document, 02/27/07, docket entry number 267.)

## I.

## BACKGROUND

The record in this proceeding includes a letter opinion written by the Honorable Bentley E. Story, Circuit Judge, Division Three, First Judicial Circuit of Arkansas, Monroe County, which contains a thorough and well-written history of events leading up to the various bankruptcy proceedings. (Creditor's Ex. 21 A.) According to the letter, Robinson has a B.A. Degree in Criminal Justice and served in law enforcement jobs for several years. (Creditor's Ex. 21 A. at 9.) He was sheriff of Pulaski County for four years and elected as a member of the United States Congress for a period of time. (Creditor's Ex. 21 A. at 9.)

The letter opinion stated that since 1988 Robinson had farmed land in Monroe County near Brinkley, Arkansas. (Creditor's Ex. 21 A. at 9.) He leased this land through a partnership known as Ag–Pro Farms, which was owned by Robinson and his family, from an entity known as Ag–Pro Farms, Inc. of Wyoming. (Creditor's Ex. 21 A at 3.) Robinson was president of Ag–Pro Farms, Inc. of Wyoming, but not a shareholder. (Creditor's Ex. 21 A at 3.) Ag–Pro Farms, Inc. of Wyoming was owned by the Stephens family of Little Rock, Arkansas. (Creditor's Ex. 21 A at 3.)

During the time Robinson operated Ag–Pro Farms he also operated a hunting business known as Cache River Deer and Duck Hunting, Inc. (Creditor's Ex. 21 A at 4.) A small lodge was located on the land

and one of his principal clients was Stephens, Inc. of Little Rock, Arkansas. (Creditor's Ex. 21 A at 4.) Robinson arranged with Stephens, Inc. for its top clients to hunt and in exchange Robinson was paid $75,000.00 a year in September, a bonus of $25,000.00 after duck season, and additional bonuses. (Creditor's Ex. 21 A. at 9.) While Robinson's duck and deer hunting business was successful, Robinson suffered farm losses of $500,000.00 per year in the past. (Creditor's Ex. 21 A. at 9.)

When Robinson announced that he intended to run for Congress against incumbent Congressman Marion Berry he was notified that his long-standing option to purchase the land, which was to run until 2008, was accelerated and Robinson was given a 30–day deadline. (Creditor's Ex. 21 A at 3 & 20.) Thereafter, Robinson, his wife, sons, and Thompson formed Ag–Pro Farms of Arkansas, Inc. (Creditor's Ex. 21 A at 3.) Thompson held 52% controlling interest in the new corporation. (Creditor's Ex. 21 A at 4.)

On March 18, 2002, Ag–Pro Farms of Arkansas, Inc. acquired title to a 2,415 acre tract of land from Ag–Pro Farms, Inc. of Wyoming for the sum of $1,890,623.00, money that was borrowed from First State Bank of Lonoke. (Creditor's Ex. 21 A at 4.)

On June 20, 2002, Wildlife Farms was formed. (Creditor's Ex. 21 A at 4.) One-third of Wildlife Farms was owned by DBJ Investments, LLC, one-third was owned by B & L Thompson Investments, LLC, and one-third was owned by Ag–Pro Farms of Arkansas, Inc. (Creditor's Ex. 21 A, p. 4.) At that point, Ag–Pro Farms of Arkansas, Inc. was solely owned by Robinson and his family because Thompson had cancelled his interest in the entity. (Creditor's Ex. 21 A at 4.)

Wildlife Farms then borrowed $2,950,000.00 to purchase the 2,415–acre farm and an additional 120 acres. (Creditor's Ex. 21 A at 4.) The purpose of the creation of Wildlife Farms was to construct and operate an upscale hunting operation. (Creditor's Ex. 21 A at 21.)

Wildlife Farms agreed to lend Robinson's entity, Ag–Pro Farms of Arkansas, Inc., $175,000.00 secured by a security interest in Ag–Pro Farms of Arkansas, Inc.'s interest in Wildlife Farms. (Creditor's Ex. 21 A at 4–5.) Of the $175,000.00 loan proceeds to Ag–Pro Farms of Arkansas, Inc., $100,000.00 was used to pay an obligation of Robinson at Community Bank and the other $75,000.00 was used in Robinson's farming partnership. (Creditor's Ex. 21 A at 5 & 18.)

Judge Story's letter opinion recounts numerous instances of strife, threats of violence, and quarreling among the parties owning interests in Wildlife Farms. (See Creditor's Ex. 21 A.) On November 19, 2002, litigation commenced in the Circuit Court of Monroe County, Arkansas, when Robinson and his family filed the initial complaint. (Creditor's Ex. 21 A at 5.) Litigation consisted of complaints, counterclaims, and claims of setoff, all of which were resolved by Judge Story's letter opinion of November 2004, which was, in general, mostly unfavorable to Robinson and his family. (Creditor's Ex. 21 A.) The Circuit Court found, among other things, that the $175,000.00 debt owed by Ag–Pro Farms of Arkansas, Inc. was in default and ordered the entity's one-third interest in Wildlife Farms sold pursuant to Arkansas law unless the judgment was paid in ten days. (Creditor's Ex. 21 A at 23–24.)

## II.

## BANKRUPTCY

On September 3, 2004, before any final judgment could be entered of record, Ag–Pro Farms of Arkansas, Inc. filed a volun-tary petition for relief in this Court under the provisions of Chapter 11 of the United States Bankruptcy Code. (Creditor's Ex. 20; Bankruptcy Case 2:04–bk–20447, Chapter 11 Voluntary Petition, 09/03/04, docket entry number 1.)

The schedules filed in the Chapter 11 case listed a disputed debt of $175,000.00. (Bankruptcy Case 2:04–bk–20447, Deficient Schedules, 10/06/04, docket entry 23.) The assets, valued at $2,277,333.33, were described as a one-third interest in a 2,500–acre farm in Monroe County, Arkansas, the sum of $194,000.00 for services rendered to Wildlife Farms, and a claim for crop damage. (Bankruptcy Case 2:04–bk–20447, Deficient Schedules, 10/06/04, docket entry number 23.) The shareholders were listed as Tommy and Carolyn Robinson. (Bankruptcy Case 2:04–bk–20447, Deficient Schedules, 10/06/04, docket entry number 23.)

On October 28, 2004, the case was converted to Chapter 7 on motion of the Debtor, Ag Pro Farms of Arkansas, Inc. (Creditor's Ex. 20 and Bankruptcy Case 2:04–bk–20447, Order and Notice of Conversion, 10/28/04, docket entry number 34.) On December 13, 2004, the Debtor consented to an Order granting relief from the automatic stay to permit Wildlife Farms to complete its foreclosure of its security interest and the Debtor's interest in Wildlife Farms. (Creditor's Ex. 9a.; Bankruptcy Case 2:04–bk–20447, Consent Order, 12/13/04, docket entry number 50.)

The Trustee declared the case a no-asset case and the case was closed June 1, 2005. (Bankruptcy Case 2:04–bk–20447, Bankruptcy Case Closed, 06/01/04, docket entry number 65.) On February 4, 2005, Judge Story entered an order approving a commissioner's sale of Ag–Pro Farms of Arkansas, Inc.'s interest in Wildlife Farms to Wildlife Farms for a credit bid of $223,774.26. (Creditor's Ex. 9a.)

Two of Robinson's business entities, Brinkley Truck & Tractor Towing & Recovery and Brinkley Truck & Tractor, Inc., also filed voluntary petitions for relief under the provisions of Chapter 11 on September 3, 2004.[1] (Bankruptcy Case 2:04–bk–20495, Chapter 11 Voluntary Petition, 09/03/04, docket entry number 1 and Bankruptcy Case 2:04–bk–20448, Chapter 11 Voluntary Petition, 09/03/04, docket entry number 1.)

On March 25, 2005, two involuntary petitions for relief under the provisions of Chapter 7 of the United States Bankruptcy Code were filed in separate cases against Tommy and Carolyn Robinson by Wildlife Farms, Rothwell, and Thompson. (Bankruptcy Case 2:05–bk–13915, Chapter 7 Involuntary Petition, 03/25/05, docket entry number 1 and Bankruptcy Case 2:05–bk–13916, Chapter 7 Involuntary Petition, 03/25/05, docket entry number 1.) Both Tommy and Carolyn Robinson were adjudicated Chapter 7 Debtors. (Bankruptcy Case 2:05–bk–13915, Order for Relief, 10/05/05, docket entry number 79 and Bankruptcy Case 2:05–bk–13916, Order for Relief, 10/05/05, docket entry number 48.)

Brinkley Truck & Tractor, Inc. and Brinkley Truck & Tractor Towing and Recovery were later converted to Chapter 7 cases. (Bankruptcy case 2:04–bk–20495, Order and Notice of Conversion, 09/05/06, docket entry number 102 and Bankruptcy Case 2:04–bk–20448, Order and Notice of Conversion, 09/05/06, docket entry number 96.) On November 20, 2006, all four cases were administratively consolidated for convenience of administration into the case of Tommy F. Robinson. (Bankruptcy case 2:04–bk–20495, Order for Administrative Consolidation, 11/20/06, docket entry number 130; Bankruptcy case 2:04–bk–20448, Order for Administrative Consolidation, 11/20/06, docket entry number 127; Bank-

ruptcy case 2:05–bk–13916, Remark, 01/05/07; Tr. 02/26/07 at 16.)

Frederick S. Wetzel ("Trustee") was appointed Chapter 7 Trustee over all of the related cases. (Creditor's Ex. 12 Ex. B; Bankruptcy Case 2:04–bk–20495, Order Granting Application to Employ Frederick S. Wetzel, 11/03/06, docket entry number 123; Bankruptcy case 2:04–bk–20448, Order Granting Application to Employ Frederick S. Wetzel, 11/03/06, docket entry number 121; Bankruptcy case 2:05–bk–13916, Notice of Appointment of Successor Trustee, 01/20/06, docket entry number 91.) Robinson's scheduled assets were valued at $758,437.05 and liabilities at $3,618,014.58. (Bankruptcy case 2:05–bk–13915, Amended Schedules, 10/19/06, docket entry number 85.)

On July 12, 2006, Thompson, one of the petitioning creditors, filed a motion for contempt against Robinson and his two sons, Greg and Jeff Robinson, for committing an assault and battery against Thompson in retaliation for Thompson's efforts to assist a potential purchaser of a liquor store owned by the Estate of Carolyn Robinson. (Bankruptcy Case 2:05–bk–13915, Motion for an Order of Contempt, 07/12/06, docket entry number 176.)

After a hearing on the motion, the Court, on July 28, 2006, entered its Order. (Creditor's Ex. 7.) The Order provided as follows:

### Order Regarding Motion For Order Of Contempt

Now on this 26th day of July, 2006, comes on to be heard the Motion for Order of Contempt filed herein by Bill Thompson, and on the basis of that motion, the pleadings filed herein, the documentary and oral evidence introduced at the hearing of this matter and the state-

---

**1.** Ag–Pro Farms II, a partnership owned by Robinson, his wife and two sons, also filed for Chapter 11 on September 3, 2004. (Creditor's Ex. 1.)

ments and arguments of counsel, the Court hereby finds and orders as follows:

1. Bill Thompson ("Thompson") is a creditor in this bankruptcy proceeding; Thompson is also a plaintiff in an adversary proceeding in this case styled *Wildlife Farms II, LLC, et al. v. Tommy F. Robinson and Carolyn B. Robinson*, 2:06–ap–1111.

2. On July 12, 2006, Thompson filed a Motion for Order of Contempt pursuant to 18 U.S.C. § 401(a) and Rules 9020 and 9014 of the Rules of Bankruptcy Procedure.

3. The Court made its oral findings of fact and conclusions of law on the record in open Court and such are adopted here.

4. Pursuant to those findings, the Court hereby enjoins and restrains Tommy F. Robinson and any persons acting for or at his behest from engaging in or taking any actions to interfere in any way with the administration of these jointly administered bankruptcies or the sale of assets of the bankruptcy estates by the Trustee, including but not limited to any actions to coerce, intimidate, harass, hinder or threaten the Trustee, any creditors, attorneys or parties in interest in these jointly administered bankruptcies until their completion or closure.

5. The transcript of the hearing on the Motion for Order of Contempt as well as the findings of this Court shall be referred by the Court to the appropriate governmental agency or office for investigation to determine if any criminal statutes have been violated.

IT IS SO ORDERED.

(Creditor's Ex. 7.)

The Trustee testified that he met with Robinson and his attorney, Sheila Campbell, in March or April of 2006 and they discussed the Wetlands Reserve Easement ("Easement") that had been granted to Wildlife Farms by the United States for $1.6 to $1.7 million paid to Wildlife Farms. (Tr. 02/26/07 at 17–18.) Robinson and his counsel thought the estate might have a cause of action to pursue because the existence of the Easement had not been disclosed to Judge Story at the time Ag–Pro Farms of Arkansas, Inc.'s interest in Wildlife Farms had been foreclosed. (Tr. 02/26/07 at 18.)

The Trustee contacted counsel for Wildlife Farms, Thompson, and Rothwell and asked for detailed information concerning the transaction. (Tr. 02/26/07 at 18.) Thereafter, on March 21, 2006, counsel wrote the Trustee a detailed letter explaining about the Easement and provided an accounting of monies received for the Easement. (Creditor's Ex. 9a.)

Ag–Pro Farms of Arkansas, Inc.'s interest in Wildlife Farms was foreclosed and sold on January 27, 2005 at a public auction to Wildlife Farms for a credit bid of $223,774.76. (Creditor's Ex. 9a.) Prior to that auction, Wildlife Farms had negotiated an option that would allow the United States to impose a wildlife easement on August 9, 2004, but the option expired without being executed. (Tr. 02/26/07 at 82.) The proposed option could only be exercised by the United States and not by Wildlife Farms.

Thereafter, on May 17, 2005, a new option was issued and it was executed and closed on August 9, 2005. (Creditor's Ex. 9a.) The option covered 2,472 acres, and Wildlife Farms received the net sum of $1,635,074.00. (Creditor's Ex. 9b.) The closing of the transaction was complicated

because the existing lien holders had to execute subordination agreements to the rights of the United States. (Creditor's Ex. 9b.) Wildlife Farms provided an accounting of the distribution of the proceeds received for the sale of the Easement:

| First State Bank of Lonoke | $1,000,000.00 |
| The Capital Bank | $ 248,679.35 |
| Bill and Boyd Joint Account | $ 70,000.00 (reimbursement) |
| Boyd Rothwell | $ 62,500.00 (reimbursement) |
| Bill Thompson | $ 62,000.00 (reimbursement) |
| Hot Parts Logistics Ins. | $ 95,000.00 |
| Producers Tractor | $ 6,336.19 (lawn mower) |
| Robert White | $ 4,000.00 (boat) |
| Belchers Taxidermy | $ 6,700.00 (mounts for lodge) |
| Construction Account | $ 63,454.69 |
| Ford Credit | $ 1,473.06 (pay off van) |
| Bancorp South | $ 2,217.42 (payoff truck) |
| Operating Funds | $ 12,713.79 |

(Creditor's Ex. 9b.)

No portion of the proceeds from the sale of the Easement was distributed to any of the stockholders of Wildlife Farms, except as reimbursement for monies lent to cover operating expenses of Wildlife Farms. (Creditor's Ex. 9a. & 9b.)

Rothwell testified he never informed Judge Story about the Easement payment of $1,675,000.00; however, the Court notes that Ag–Pro Farms of Arkansas, Inc.'s interest had been foreclosed in January 2005, several months before Wildlife Farms received the option to impose the Easement. (Tr. 02/26/07 at 86; Creditor's Ex. 9b, attached as Ex. C; Tr. 02/26/07 at 60 & 88.) Rothwell acknowledged that he did not discuss with Robinson the August 2004 option to impose easement. That option was never exercised and eventually expired. (Tr. 02/26/07 at 89.)

After the information about the Easement was provided by Wildlife Farms to the Trustee, the Trustee decided to negotiate a settlement on behalf of the estate with Wildlife Farms, Thompson, and Rothwell, instead of attempting to set aside the order foreclosing Ag–Pro Farms Inc.'s interest in Wildlife Farms. (Creditor's Ex. 1 and Tr. 02/26/07 at 20.)

The settlement was complicated and consisted of resolutions of numerous issues dealing with Robinson's counterclaims and Robinson's defenses to the foreclosure of Ag–Pro Farms Inc.'s interest in Wildlife Farms. (Creditor's Ex. 1.) Robinson had filed two post-petition civil actions. One was filed in the United States District Court against Thompson and others under the RICO statute. That case (Case Number 4–04–CV–142 GH) was dismissed on May 9, 2005, on abstention grounds. The other suit was filed in the Circuit Court of Monroe County, Arkansas (Case Number CV–2005–88). (Creditor's Ex. 1.) There were also numerous partially perfected appeals by Robinson or one of his business entities from judgments against him, his family, and/or business entities. (Creditor's Ex. 1.)

The settlement entered into by the Trustee and all of the defendants in the actions filed by Robinson and his business entities was a "global settlement" of all of the issues that were and/or could have been raised by the Trustee against Wildlife Farms, Rothwell, Thompson, and other individuals, including the issue relating to the Easement. (Creditor's Ex. 1.)

The Trustee filed a motion seeking Court approval of the settlement and sent notice to all parties in interest, including the Debtors and their counsel. (Creditor's Ex. 1 and Tr. 02/26/07 at 20–21.)

The motion for approval of compromise settlement states in relevant part:

After the trial court in the state court cases had made substantial findings of fact and conclusions of law which were adverse to the debtors, the debtors non-suited their complaint and counterclaims and filed an action based on the Racketeer Influence and Corrupt Organizations Act ("RICO") in the United States District Court ... Case No. 4–04–CV–142–GH. The federal court RICO case

was dismissed on May 9, 2005 on abstention grounds based upon the state court cases which involved most of the same factual allegations and issues.

. . . .

On July 27, 2005, the debtors along with BT & T Towing, Ag–Pro Corporation, Ag–Pro Partnership and the Liquor Store filed a state court case against numerous defendants most of whom had been parties in the state court cases and the federal court RICO case. The Complaint in this case is based upon RICO and is . . . Monroe County Circuit Court Case No. CV–2005–88.

. . . .

The debtors have recently asserted a counterclaim against Wildlife Farms II, LLC, Bill Thompson and Boyd Rothwell in the United States Bankruptcy Court, Eastern District of Arkansas, Helena Division in A.P. No. 2:06–AP–1111 which is based upon many of the same underlying causes of action as contained in the state RICO case.

(Creditor's Ex. 1.)

The counterclaim filed by Robinson in an adversary proceeding, Bankruptcy case number 2:06–ap–1111, specifically alleges that Wildlife Farms, Thompson, and Rothwell committed fraud by not revealing the existence of the Easement, that the Robinsons' one-third interest was converted, and that the sale of the Robinsons' interest should be set aside. (Creditor's Ex. 2.)

The Robinsons objected to the proposed compromise settlement, specifically on the grounds that the estate was entitled to one-third of the proceeds of the Easement in the sum of $1,730,484.00. (Creditor's Ex. 3.)

A hearing was conducted on the motion to approve the compromise settlement; the Trustee testified in support of the settlement, and the Debtors appeared and testified in opposition to the settlement. (Bankruptcy case 2:05–bk–13915, Hearing Held, 6/7/6, docket entry number 166; Tr. 02/26/07 at 26–27.) At the conclusion of the hearing, the settlement was approved and an order was entered on June 8, 2006, from which no appeal was taken. (Creditor's Ex. 4; Bankruptcy Case 2:05–bk–13915, Order Settling Application for Compromise Controversy, 06/08/06, docket entry number 170.)

Thereafter, the Trustee executed various documents dismissing appeals and lawsuits and executing releases as Trustee for the Robinsons and the various business entities in favor of Wildlife Farms and all the individuals named in the state and federal RICO action, including Rothwell, Thompson, and Wildlife Farms. (See Creditor's Exs. 10, 11 & 12.) Robinson specifically dismissed his counterclaim with prejudice regarding the Easement in the adversary proceeding, case number. AP 06–1111. (Creditor's Ex. 5.)

Settlement was also reached with Greg Robinson and Jeff Robinson, who had been parties to the litigation mentioned previously, in exchange for satisfaction of the judgment against them by Wildlife Farms. (Creditor's Ex. 15.) Greg Robinson and Jeff Robinson each executed separate absolute releases in favor of Wildlife Farms, Rothwell, and Robinson. (Creditor's Ex. 15.)

After settling with the Trustee, Wildlife Farms decided to try to sell the entire property now subject to the Easement. For these purposes, Wildlife Farms hired National Auction Group of Gadsden, Alabama, to conduct an auction. (Tr. 02/26/07 at 66.) The auction was advertised widely in the Wall Street Journal and in regional newspapers in Dallas, Texas; Memphis, Tennessee; and Little Rock, Arkansas. (Tr. 02/26/07 at 67.) The National Auction Group also sent notices to their established clientele. (Tr. 02/26/07 at 67.) The planned auction was an absolute auction,

meaning the property would be sold regardless of price. (Tr. 02/26/07 at 67.) Wildlife Farms was required to advance $110,000.00 to cover costs and marketing efforts associated with the auction. (Tr. 02/26/07 at 67–68.)

The absolute auction was scheduled to occur at the premises in Monroe County, Arkansas, on December 19, 2006, at 1:00 p.m. (Tr. 02/26/07 at 78.) Wildlife Farms had the property appraised in connection with the proposed auction. Appraisals ranged from $8 to $10 million, but the appraisals were never offered into evidence. (Tr. 02/26/07 at 95.)

Wildlife Farms still owes secured debts of $2,107,955.37 to First State Bank of Lonoke. (Creditor's Ex. 9a.) Wildlife Farms has never been profitable and has never even generated enough income to cover operating expenses, much less debt service. Some members of Wildlife Farms have been required to contribute almost one million dollars to maintain the ongoing operation. (Creditor's Ex. 9a.) Robinson and his family never paid any money for their share of the operating deficit. (Creditor's Ex. 9a.) With Robinson's history of violent behavior and his enthusiasm for endless litigation, the price the property will bring at auction is anybody's guess.

Lewellan testified that he represented the Robinson in the state court litigation filed in 2002 that included the cause of action to foreclose Ag–Pro Farms of Arkansas, Inc.'s interest in Wildlife Farms. (Tr. 02/26/07 at 120.) According to Lewellan, the existence of or possibility of the Easement was never mentioned to anyone in the state court action, including Judge Story. (Tr. 02/26/07 at 120.) Lewellan testified that he did not become aware of the Easement until December 17, 2006. (Tr. 02/26/07 at 124.)

On the Saturday before the sale, which was set for the following Tuesday, December 19, 2006, Robinson visited Lewellan's home in Marianna, Arkansas, at 10:30 or 11:00 a.m. to discuss the pending auction. (Creditor's Ex. 23 and Tr. 02/26/07 at 159.) Robinson told Lewellan that the property was about to be sold and inquired about how to stop the sale. (Tr. 02/26/07 at 161.) Robinson said he felt that the defendants had defrauded him and cheated him and his family out of his one-third interest in Wildlife Farms and that his interest was worth millions. (Tr. 02/26/07 at 162–163.) Further, Robinson testified that he did not interpret the Court's July Order restraining him from interfering with the administration of the estate as precluding him from the filing of a lawsuit, only that he could not use physical threats against the Trustee or one of the other persons trying to dispose of the property. (Tr. 02/26/07 at 163.)

After conferring with Robinson, Lewellan prepared a 16–page complaint, which, on the Monday before the auction, he filed in the Circuit Court of Monroe County, Arkansas, on behalf of Robinson, Carolyn Robinson, Greg Robinson, Jeff Robinson, Ag–Pro of Arkansas, Inc., and Ag–Pro Farms, II, against Wildlife Farms, DBJ Investments, Rothwell, Dianna Rothwell, John Lewis, Kimberly Lewis, Daniel Barnett, Sr., Sally Barnett, B & L Thompson Investments, LLC, Thompson, Elizabeth Thompson, John Doe I, and John Doe II. (Creditor's Ex. 21 and Tr. 02/26/07 at 146.)

The complaint was assigned case number CIV–2006–120–3. (Creditor's Ex. 22.) The complaint alleged generally that the defendants had failed to disclose the contract for the imposition of the Easement to the Court and that this failure to disclose constituted fraud. The complaint asked the court to set aside its judgment of foreclosure of Robinson's interest in Wildlife Farms entered in December 2004 (CV–2002–103) and award unspecified damages to the plaintiffs. (Creditor's Ex. 21.)

Lewellan also caused to be filed a Notice of Lis Pendens in the records of the Circuit Court of Monroe County, Arkansas, on the same date. (Tr. 02/26/07 at 130.)

As a result of the filing of the lawsuit and the Lis Pendens notice, the auction was cancelled and ultimately this contempt action was commenced. (Tr. 02/26/07 at 80.) Also, at the suggestion of Judge Story, Lewellan and Sheila Campbell filed a motion for relief from the automatic stay, which was heard at the same time as the contempt action. (Tr. 02/26/07 at 135–136 and Bankruptcy case 2:05–bk–13915, Motion for Relief from Stay, 01/09/07, docket entry number 244.)

## III.

### WHETHER TOMMY ROBINSON IS IN CRIMINAL CONTEMPT

Under the Bankruptcy Code, when a debtor files a bankruptcy petition, an estate is created that consists of all the debtor's "legal or equitable interests ... in property as of the commencement of the case." 11 U.S.C. § 541(a)(2006).

■ The concept of property of the estate is broadly construed and includes causes of action belonging to the debtor at the time the case is commenced. *Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223 (5th Cir.2001)(citing *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245 (5th Cir.1988) (citations omitted)); *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez (In re Alvarez)*, 224 F.3d 1273, 1278 n. 12 (11th Cir.2000)(citing *Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1064 n. 10 (11th Cir.1996); *Miller v. Shallowford Community Hosp.*, 767 F.2d 1556, 1559 (11th Cir.1985)); *Kollar v. Miller (In re Kollar)*, 176 F.3d 175, 178 (3d Cir.1999)(citing *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir.1997); H.R.Rep. No. 95–595, 95th Cong. 2nd Sess. at 175–76 (1978), U.S.Code Cong. & Admin.News 1978, p. 5963); *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir.1997)(citing *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988)); *Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prod. Co.)*, 102 F.3d 223, 225 (6th Cir. 1996); *Mixon v. Anderson (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222, 1225 (8th Cir.1987); *Vreugdenhil v. Hoekstra*, 773 F.2d 213, 215 (8th Cir.1985)(citing *In re Smith*, 640 F.2d 888(7th Cir.1981)).

See also *Gorka v. Joseph (In re Atlantic Gulf Communities Corp.)*, 326 B.R. 294, 299 (Bankr.D.Del.2005) (instructing that even speculative litigation claims are property of the estate) (citing *In re Alvarez*, 224 F.3d at 1279–80; *Polis v. Getaways, Inc. (In re Polis)*, 217 F.3d 899, 902 (7th Cir.2000); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir.1999); *In re Jordan*, 63 F.2d 534, 535–36 (5th Cir.1933); *In re Anderson*, 128 B.R. 850, 853 (D.R.I.1991)).

Therefore, under the Bankruptcy Code the cause of action to set aside the Order of the Circuit Court of Monroe County, Arkansas, entered in January 2005, was property of the estate, even though not scheduled.[2] *See In re Miller*, 347 B.R. 48, 53 (Bankr.S.D.Tex.2006) (stating Bankruptcy Code does not require cause of action to be scheduled in order for cause to become property of the estate upon the filing of bankruptcy petition); *Tilley v. Anixter Inc.*, 332 B.R. 501, 507

---

**2.** The cause of action belonged to Ag–Pro Farms of Arkansas, Inc., the debtor in a closed Chapter 7 case. Assuming such a cause of action existed, upon the liquidation of the corporation any asset would have vested in the shareholders, Tommy and Carolyn Robinson's estate, which is still open and represented by the Trustee.

(D.Conn.2005)(ruling that any cause of action that the debtor possesses at the time of the bankruptcy filing is property of the estate, regardless of whether the debtor has scheduled the cause of action) (citing *Correll v. Equifax Check Servs., Inc.,* 234 B.R. 8, 10 (D.Conn.1997)).

■ The Bankruptcy Code authorizes the trustee in a particular case to be the representative of the estate with the capacity to sue and be sued. 11 U.S.C. § 323 (2006). The trustee shall "collect and reduce to money the property of the estate for which such trustee serves...." 11 U.S.C. 704(a)(1)(2006). Thus, the Bankruptcy Code empowers the trustee to pursue a debtor's claim. Moreover, the trustee "holds the exclusive right to assert a debtor's claim." *eRealbiz.com LLC v. Protocol Communications, Inc. (In re Real Mktg. Servs., LLC),* 309 B.R. 783, 788 (S.D.Cal.2004). *See also Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1002 (9th Cir.2005) (opining that trustee has standing to bring any action debtor corporation could have instituted prior to bankruptcy) (citing *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991) (citations omitted)); *In re Segerstrom,* 247 F.3d at 224 (recognizing that trustee who prosecutes a cause of action derived from the debtor stands in shoes of debtor); *Cable v. Ivy Tech State College,* 200 F.3d 467, 472 (7th Cir.1999)(pointing out that in chapter 7, only the trustee has standing to prosecute a claim belonging to estate) (citations omitted); *In re Van Dresser Corp.),* 128 F.3d at 947 (stating "appointed trustee has the exclusive right to assert the debtor's claim") (citing *Schertz–Cibolo–Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1284 (5th Cir.1994)); *In re RCS Engineered Prod. Co.,* 102 F.3d at 225 (ruling debtor's prepetition causes of action are property of the estate to be pursued by the trustee) (citations omitted); *Jones v. Harrell,* 858 F.2d 667, 669 (11th Cir.1988) (stating trustee in bankruptcy succeeded to debtor's prepetition personal injury claim and had exclusive authority to settle and release claim); *In re Ozark Restaurant Equip. Co.,* 816 F.2d at 1225 (recognizing that upon bankruptcy filing, any unresolved cause of action passes to the trustee who is authorized to assert claims of the estate); *In re Miller,* 767 F.2d at 1559 (stating that the trustee succeeds to all causes of action held by debtor upon the bankruptcy filing, including actions arising under contract).

A corollary to the rule that the trustee succeeds to the debtor's prepetition causes of action is that a debtor no longer has standing to pursue his claims once they become property of the estate upon the commencement of the bankruptcy case. *Wolfe v. Gilmour Mfg. Co.,* 143 F.3d 1122, 1126 (8th Cir.1998) (citing *Forrest v. Eilenstine,* 5 Neb.App. 77, 554 N.W.2d 802, 807 (1996)); *Tilley,* 332 B.R. at 507 (citing *Seward v. Devine,* 888 F.2d 957 (2d Cir.1989)).

Compromises and settlements between the trustee and other parties-in-interest are subject to approval by the bankruptcy court. Fed. R. Bankr.P. 9019 ("On motion of the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.").

■ A party in interest who objects to the trustee's proposed settlement initiates a contested matter that requires a hearing. 10 Collier on Bankruptcy ¶ 9019.01 (Alan N. Resnick & Henry J. Sommer, et al. eds., 15th ed. rev.2007) (citing *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),* 283 F.3d 159, 164 (3d Cir.2002)). If the court approves a settlement, a final order of court approval is entered that has

the same *res judicata* effect as any other final order of the court. *Bezanson v. Bayside Enters. Inc. (In re Medomak Canning)*, 922 F.2d 895, 900 (1st Cir.1990)(citing *Arrieta–Gimenez v. Arrieta–Negron*, 859 F.2d 1033, 1041 (1st Cir.1988)) *(certified question answered*, 551 So.2d 1184 (Fla.1989), *summary judgment granted*, 896 F.2d 16 (1st Cir.1990)).

■ Applying these widely recognized principles of bankruptcy law and procedure, the Court finds that the cause of action to set aside the foreclosure for fraud that Robinson filed in state court was property of the estate. Only the Trustee possessed the authority to prosecute that claim. Once adjudicated a debtor, Robinson lost standing to pursue the claim that he nevertheless later filed.

The Trustee, after notice and a contested hearing and for valuable consideration, settled the cause of action and all other known and unknown causes of action with the defendants in the state court action. (Creditor's Ex. 1; Creditor's Ex. 4.) Referring to the counterclaim Robinson filed in adversary proceeding 06–1111 that alleged fraudulent concealment of the Easement, the Trustee's Motion for Compromise Settlement states, "This settlement would also include the dismissal with prejudice of the bankruptcy counterclaim and the release of all claims against the counterdefendants in the case as well." (Creditor's Ex. 1 at 4.)

Robinson may have disagreed with the Trustee's decision to settle and this Court's decision to approve the settlement, but he did not appeal the order approving the settlement. Therefore, the claim Robinson filed in December 2006 in state court is *res judicata* and the cause of action is extinguished.

Furthermore, in reliance on the authority of the Bankruptcy Court's order and with authority provided by the Bankruptcy Code, the Trustee of Robinson's estate executed releases in favor of the defendants and received in return an agreed upon sum of money. (Creditor's Ex. 12.) A release is a type of contract and general contract rules apply. *Little Rock Packing Co. v. Mass. Bonding & Ins. Co.*, 262 F.2d 327, 329 (8th Cir.1959)(citing C.J.S. Release § 38). One important aspect of a release is that it is a "binding agreement between the parties under which at least one party to the agreement relinquishes an existing claim or cause of action against another party to the agreement ..." 29 Williston on Contracts § 73.1 (4th ed.) (citations omitted).

Under contract principles, the Trustee entered into a binding agreement not to pursue causes of action which the Trustee "had, now has or which his successors or assigns hereinafter can, shall or may have or assert ... arising out of ... the causes of action asserted, the allegations of fact and the transactions and events described in the RICO case ..." (Creditors' Ex. 11.)

As noted above, Robinson raised the same issue of fraudulent concealment of the Easement in his answer and counterclaim to the complaint objecting to discharge (adversary proceeding 06–1111) and in his objection to the Trustee's motion to settle. (Creditor's Exs. 2 & 3.) He dismissed his claim of fraud with prejudice in the adversary proceeding dealing with the objection to discharge, and his objection to the motion to settle was overruled and he did not appeal. (Creditors' Exs. 4 & 5.) Dismissal of an action with prejudice is "a complete adjudication of the issues presented by the pleadings and bars further action between the parties." *Daewoo Electronics Corp. of America Inc. v. W. Auto Supply Co.*, 975 F.2d 474, 478 (8th Cir.1992)(quoting *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590, 593 (8th Cir. 1968)).

When Robinson filed the complaint for equitable relief on the eve of the auction, he was attempting to exercise control over property of the estate. Moreover, he has continued to allege the same facts in successive actions even after the previous actions have been resolved against him or have been settled by the Trustee over Robinson's objection.

■ The precipitous manner in which Robinson filed the state court lawsuit on the day before a scheduled auction demonstrates by clear and convincing evidence that he was knowingly and intentionally interfering, again, with the Trustee's administration of the estate. The lawsuit was a blatant attempt to relitigate matters that have been finally concluded as a matter of law. Through the lawsuit, Robinson was endeavoring to undermine the validity and integrity of the Trustee's releases and the Court's order approving a settlement that was not to Robinson's liking.

Robinson has been previously warned not to interfere with the administration of the estate and is under a specific Court order to refrain from such conduct. Yet he has interfered a second time and in a manner that has had serious repercussions. Therefore, this Court finds that such conduct constitutes criminal contempt.

Because Robinson is found to be in criminal contempt, the Court orders the following sanctions:

1. Robinson shall pay to the named defendants in the state court lawsuit all allowed attorney's fees and costs ordered by the Court by subsequent order.

2. Robinson shall pay a fine of $5000.00 due forthwith to the Clerk of the United States Bankruptcy Court for the Eastern District of Arkansas.

3. Robinson shall be remanded into the custody of the United States Marshall for the Eastern District of Arkansas and shall be incarcerated at a place chosen by the Marshall for a period of six months. However, this sanction shall be suspended provided that Robinson refrain from interfering with the administration of these bankruptcy estates ever again in his lifetime. Interference with the administration of the estate may include assault, battery, threats, and filing frivolous pleadings, motions, and lawsuits in this or any other court.

Because this Order of Contempt is brought pursuant to Federal Rule of Bankruptcy Procedure 9020 and involves findings of criminal contempt, the Court elects to proceed under Federal Rules of Bankruptcy Procedure 9033(b) and 9020. *See Brown v. Ramsay (In re Ragar)*, 3 F.3d 1174, 1177–78 (8th Cir.1993) (Arnold, J.)(ruling bankruptcy court acted within its authority and pursuant to Rule 9033 in holding debtor's attorney in criminal contempt but providing for district court's de novo review if attorney objected to bankruptcy court's order of contempt within 10 days).

The Bankruptcy Clerk shall forthwith serve a copy of this Order of Contempt on Robinson. This Order of Contempt shall become effective as a final order of criminal contempt unless within a ten (10) day period after being served, Robinson serves and files with the Clerk of the Bankruptcy Court an objection to this Order of Contempt as provided by Federal Rule of Bankruptcy Procedure 9033(b).

If an objection is filed, this Order shall be subject to review by the United States District Court for the Eastern District of Arkansas, Eastern Division, pursuant to Federal Rule of Bankruptcy Procedure 9033.

## IV.

### WHETHER ROY C. LEWELLAN IS IN CRIMINAL CONTEMPT

Lewellan filed Civil Action Number CIV–2006–120–3 in the Circuit Court of Monroe County, Arkansas, at the request of Robinson and on behalf of Robinson, Carolyn Robinson, Greg Robinson, and Jeff Robinson, without ever consulting Carolyn, Greg, or Jeff Robinson. He was not authorized to represent any of the pending bankruptcy estates as an attorney. Although Lewellan claims that he had no knowledge of the restraining order issued in July 2005, he had ample time to conduct an inquiry after he was served with a motion for contempt. Assuming he investigated the restraining order, he did nothing in response to that knowledge.

Before he filed the complaint, Lewellan obviously did not look into the merits of the complaint in relation to the Robinsons' bankruptcy cases. Nor did he acquaint himself with the applicable law. He apparently was unaware of the fact that the Trustee had executed releases for Tommy and Carolyn Robinson and all of the Robinson entities and had settled the cause of action that Lewellan filed. He also made no effort to discover that Greg Robinson and Jeff Robinson executed separate releases with the defendants for a valuable consideration. Further, Lewellan's testimony that Robinson is not bound by the Trustee's settlement is a gross misstatement of the law.

The Court has previously found that Lewellan was in civil contempt, and he was incarcerated until he purged the contempt by dismissing the civil action he so inappropriately filed. The Court thinks the circumstances of this case as they relate to Lewellan are more appropriately considered at a hearing scheduled for April 20, 2007. At that time, the Court will hear a motion for sanctions against Lewellan and Sheila Campbell filed by Thompson, Roth-

well, and Wildlife Farms pursuant to Federal Rule of Bankruptcy Procedure 9011.

Therefore, the Court will not hold Lewellan in criminal contempt, but rather consider the circumstances of his case at the hearing to determine if Rule 9011 sanctions will be ordered.

IT IS SO ORDERED.